UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SHAWN MICHAEL WAGNER,

                Petitioner,                  Case No. 1:10-cv-425

v.                                      Honorable Robert J. Jonker

THOMAS BIRKETT,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Following a jury trial in the Barry County Circuit Court, Petitioner was convicted of one count of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b(1)(a), and two counts of second degree criminal sexual conduct (CSC II), MICH. COMP. LAWS § 750.520c(1)(a). On November 23, 2005, the trial court sentenced him to prison terms of 15 to 25 years for the CSC I conviction and 10 to 15 years for each of the CSC II convictions. In his *pro se* petition, Petitioner raises the following grounds for relief:

    I.        [PETITIONER] WAS DENIED THE DUE PROCESS RIGHT TO A FAIR TRIAL BY THE MISCONDUCT OF THE PROSECUTOR AND POLICE TAMPERING WITH THE "SOLE" CHILD WITNESS, TRIAL AND APPELLATE COUNSEL OFFERED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE THE ISSUE.

    II.      [PETITIONER] WAS DENIED THE CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL[']S FAILURE TO OBJECT TO, JOINDER OF FOUR SEPARATE CSC CHARGES FOR ONE JURY TRIAL, FAIL[URE] TO PRESENT WITNESS(ES) NOT LIMITED TO EXPERT ON CHILD ABUSE AND IMPEACHMENT FOR COMPLEX FRAUD DEFENSE, FAIL[URE] TO OBJECT TO THE

PROSECUTOR'S EXPERT BOLSTERING COMPLAINANT, [AND] FAIL[URE] TO IMPEACH HIS OPINION AS CONTRARY TO THE AMERICAN PSYCHOLOGICAL ASSOCIATION JOURNAL ON MISINFORMATION EFFECTING [SIC] RECALL IN CHILDREN.

III.     THE CUMULATIVE ERRORS OF COUNSEL DENIED [PETITIONER] A FAIR TRIAL.

IV.     GOOD CAUSE IN FAILING TO RAISE THE CLAIM AND PREJUDICE CAN BE SATISFIED WHERE [PETITIONER] WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN FAILING TO RAISE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

(Pet., docket #1, Page ID##4-13.)  Respondent has filed an answer to the petition (docket #11), stating that the grounds should be denied because they are procedurally defaulted and have no merit. Upon review and applying the AEDPA standards, I find that the claims are procedurally defaulted and without merit.  Accordingly, I recommend that the petition be denied.

## **Procedural History**

### A.     Trial Court Proceedings

The state prosecution arose from Plaintiff's repeated sexual assaults of his ten-year-old step-daughter.  Petitioner was bound over to the circuit court on two counts of CSC I and two counts of CSC II.  Petitioner was tried before a jury beginning October 24, 2005, and concluding on October 25, 2005.

The complaining witness, K.M., identified Petitioner as her stepfather. (Tr. I[1] at 188.) K.M. spoke of her sexual anatomy as her "private parts," which she identified by circling on a drawing of a girl's anatomy.  She stated that she knew she had to cover her lower private parts,

---

[1]The trial transcripts for the two-day trial are hereafter identified as follows:

Transcript of proceedings held October 24, 2005 (docket #19):  "Tr. I at ___."
Transcript of proceedings held October 25, 2005 (docket #20):  "Tr. II at ___."

which she also called her "crotch."  (*Id.* at 191, 193.)  She also circled the male genitalia on a

different drawing.  She had no other name for the penis than the man's "private part."  (*Id.* at 192.)

According to K.M., Petitioner touched her crotch and touched her with his private part, which felt

like a "fat finger," and he rubbed his private back and forth on her crotch.  (*Id.* at 193-94.)  She

stated that the incidents occurred sometimes at night and sometimes during the day, mostly at the

Cressey Road house, but sometimes at the trailer they had lived in earlier.  (*Id.* at 188-89, 207.)

Petitioner usually was wearing either shorts or long johns.  She usually looked away, but one time

she saw a peek of his private part.  Petitioner always took off her pajamas and underwear before he

rubbed her.  (*Id.* at 194-95.)  K.M. reported that the incidents occurred both in her bed and in his

bed.  Petitioner sometimes would spread her legs.  When he touched her, Petitioner was on top of

her, and she would sometimes be lying on her stomach and sometimes on her back.  (*Id.* at 195.)

When she was on her stomach, his private would touch her butt.  (*Id.* at 198.)  When she was on her

back, he would put her legs around his waist.  (*Id.* at 197.)  K.M. stated that sometimes Petitioner's

private part was wet, and, on occasion, she got white stuff on her.  (*Id.* at 196.)  The white stuff

sometimes was on her pajamas and one time was on her private.  When that happened, she wiped

it off and changed her clothes.  (*Id.* at 196-97.)  She remembered him putting his private on her

crotch approximately ten times.  (*Id.* at 197.)  In addition, K.M. remembered Petitioner coming into

the bathroom on occasion, while she was taking a shower.  He would stand outside the shower, turn

K.M. to face a certain way, and have her put her leg on the soap-rack side of the shower.  He then

touched his private to her privates.  (*Id.* at 199-200.)  Further, K.M. testified that Petitioner had

touched her privates with his fingers and that he would put his fingers inside and "open up her crotch

more."  (*Id.* at 201-02.)  She could not recall how many times this happened, but it was "[a] few

times." (*Id.*)  During the times he was touching her, Petitioner would ask her if it felt good.  She did

not answer, because she was scared.  He also asked her if she wanted him to stop, but she again said

nothing.  (*Id.* at 203.)  Petitioner told K.M. on multiple occasions that she should not tell anyone

because it was a secret.  (*Id.* at 204.)  But she felt bad keeping it a secret.  (*Id.*)  One day, after karate

practice, she finally told her mother that Petitioner was touching her with his private.  But she asked

her mother to tell no one because she did not want to get in trouble.  (*Id.* at 204-06.)  After supper

that evening, Petitioner came to K.M.'s room, asking, "[W]hy did you tell your mom that I was

touching you . . . . I guess if your mom tells the cops, I'm going to jail . . . . I already told you that

I promised I wouldn't touch you no more."  (*Id.* at 206.)  K.M. spoke with the police a few days

later.  (*Id.* at 207.)

        On cross-examination, K.M. admitted that her mother had told her that she also had

been touched by other people, and K.M. felt sorry for her mother.  (*Id.* at 209-11.)  K.M. also

admitted that her parents had been talking about divorce, though she could not remember if those

discussions had started before she told her mother about the touching.  (*Id.* at 212.)  K.M. testified

that she had given dates to the police when she was interviewed, but she had no memory of why she

mentioned those dates, with the exception of April 17, which she claimed to remember because the

leaves had started to fall.  (*Id.* at 213-15.)  She also reported that she had talked to Trooper Cook

before and that she had talked to the prosecutor that morning, during which he repeatedly asked her

the questions he intended to ask her at trial.  (*Id.* at 216-17.)  In addition, she stated that CPS workers

had come to her home to ask her questions and that she talked about the incidents on many occasions

with her counselor.  (*Id.* at 218-19.)

Treina Marie Wagner testified that she is the mother of K.M. and the wife of Petitioner, whom she married in 2000. (*Id.* at 223.) The family lived in a trailer in Kalamazoo County until August of 2004. Thereafter, they lived on Cressey Road in Plainwell. (*Id.* at 224, 226.) At about 11:30 p.m. on February 2, 2004, Treina Wagner put her son to sleep in the master bedroom. She returned to the living room to join her husband, but he was not there. She looked into K.M.'s room and saw Petitioner sitting in the middle of K.M.'s bed, watching her daughter, who was naked from the waist down. He then began to stroke K.M.'s inner thigh. (*Id.* at 226-27.) Petitioner was wearing his white brief underwear. (*Id.* at 227.) The room was well lit, because the parking lot lights shone into K.M.'s window. (*Id.* at 228.) After staring for a minute, she asked Petitioner "What are you doing?" He responded, "I don't know." (*Id.* at 228.) Petitioner covered K.M. again and left the room. Treina Wagner looked under the blanket and felt her daughter's legs and then recovered her. When K.M. woke up, Treina Wagner asked her whether she had noticed anything or anyone touching her. K.M. responded that she had not. (*Id.* at 228-29.) When Treina asked her daughter why her pajama bottoms were off, K.M. responded that she was hot. (*Id.* at 229-30.) Treina Wagner told her daughter to go back to bed because Treina wanted to go out to talk with Petitioner. (*Id.* at 229.) When Treina Wagner reached the kitchen, Petitioner was dressed in his boots and coat. She asked him where he was going, and he said that he was leaving and wanted to kill himself. Treina wanted an explanation of what she had seen. He said, "I don't know. No matter what I say is gonna make you look good – make me – make you look good at me." (*Id.* at 230.) Petitioner then left, taking only a sleeping bag and coats. (*Id.* at 230-31.) Treina asked where he was going and told him to be careful driving because he was upset. (*Id.* at 231.) After he left, she was confused about her feelings. She called friends to see what they thought, whether she was

exagerrating.  Her friends talked her into calling the police.  (*Id.* at 231.)  When she called the police, they told her that the only thing they could do would be to file a report, which would probably wake everyone up.  They gave her the choice of calling Child Protective Services (CPS) in the morning, and they provided her the number.  (*Id.* at 232.)  At about 1:30 a.m., she wrote in her journal, trying to get her feelings out.  She called CPS in the morning and talked to a worker.  (*Id.* at 233.)  After all of the paperwork was filed and he was not convicted, Petitioner promised to get help and promised that nothing like that would happen again.  (*Id.* at 233.)  They had many tearful conversations, during which Petitioner expressed remorse and asked Treina Wagner to help him.  (*Id.* at 234.)  She continued with her marriage, and she, K.M., and Petitioner were all in counseling.  CPS worked with their family for close to a year under a family services agreement.  Under the agreement, Petitioner was not supposed to have unsupervised visitation with K.M.  (*Id.* at 234-35.)  However, a few weeks after Petitioner was allowed home, Treina Wagner allowed Petitioner to take K.M. to a long-planned father-daughter dance.  Treina Wagner kept asking Petitioner about his counseling and urged him to call to make appointments.  She knows he attended one appointment, but he thereafter complained that he was playing phone tag with his therapist.  (*Id.* at 235.)

On March 7, 2005, Treina Wagner picked her daughter up from karate at 7:00 p.m. During the ride, K.M. told Treina that she needed to talk with her about something.  K.M. asked her mother if she remembered the incident in February when Petitioner had been in her room.  When Treina said she did, K.M. told her, "[I]t's been happening a lot more."  (*Id.* at 236-37.)  K.M. made her mother promise not to tell anyone.  They ate supper quietly when they got home.  After supper, Treina Wagner called her sister, Heather Veres, and went to the basement for privacy.  (*Id.* at 237-38.)  She was venting to her sister, telling her what K.M. had told her, when Petitioner came

downstairs, causing Treina to move her conversation back upstairs into her bathroom.  Shortly

thereafter, K.M. came in, crying, asking if Treina had told Petitioner.  (*Id.* at 238-40.)  Treina had

not told Petitioner, and she told her daughter that he must have heard her conversation from the top

of the steps to the basement.  (*Id.* at 240.)  When Petitioner came into their bedroom, Treina asked

him, "Did you touch my daughter?"  (*Id.* at 240.)  Petitioner responded, "Once or twice."  (*Id.*)

Petitioner left the house, saying that he was going to get ice cream for the family.  He came back

later with his father, Mike Wagner.  Petitioner reported that he had totaled his truck trying to miss

a deer, and he called the police department to report it.  (*Id.* at 241.)  Treina told Mike Wagner that

Petitioner needed to stay with him for awhile because Petitioner was touching her daughter again.

Mike Wagner said nothing.  (*Id.* at 242.)  Petitioner received a call back from the police and spoke

with them about the truck accident.  Then he and Mike Wagner left the house.  Mike Wagner later

returned with ice cream for everyone.  (*Id.* at 242.)  Petitioner did not return that night, and Treina

Wagner called a girlfriend to come stay with her.  (*Id.*)  The following day, Petitioner returned.

Treina was taking a nap and was wakened by her son, who informed her, "Dad's here." (*Id.* at 243.)

She woke to find her husband standing next to the bed.  Petitioner asked if she would do laundry for

him and if he could take a few things.  She told him that he could come back after the children were

in school.  (*Id.* at 243.)  Treina Wagner reported that she was frightened, as CPS had told her that,

if anything were to happen again, she would have 24 hours to find someone to take her children.

She did not call the police right away because she was afraid that she would lose her children.  (*Id.*

at 243, 247.)

On March 9, 2005, Treina Wagner called her neighbor and friend, Jody Dolfman,

telling her that she needed to talk.  After she put her son on the school bus at 12:30 p.m., Treina went

to Dolfman's house to talk. (*Id.* at 245.) The Dolfmans called an off-duty trooper, Mike Behrendt, at his home. Behrendt met Treina at the Dolfmans, and she spoke with him about what she needed to do. (*Id.* at 245-46.) Behrendt told her that he would start setting things up with the correct officials. (*Id.* at 246.) While she was at the Dolfmans, she saw her husband, his father, and other Wagners drive by her house, and they saw her car in the Dolfmans' driveway. Petitioner called the Dolfmans and asked to speak with Treina. She took the call and asked him again about how many times he had touched her daughter. He again responded, "Once or twice." (*Id.* at 246-47.)

The following day, March 10, 2005, Trooper Cook and other state police officers attempted to talk with her, but she did not speak with them. K.M., however, had gone in to make her statement. (*Id.* at 247.) Treina Wagner admitted that she had not complied with all the terms of the CPS agreement. (*Id.*) Treina Wagner acknowledged that, prior to K.M.'s revelation to her mother on March 7, 2005, the couple had been talking about divorcing. After K.M. told Treina about Petitioner's continuing touching, Treina filed immediately for divorce. (*Id.* at 248.)

Treina Wagner was cross-examined extensively on possible inconsistencies between her journal notes and her testimony in court. (*Id.* at 250-57, 262-63.) She also was cross-examined about the information she had conveyed to and questions she had asked of K.M. (*Id.* at 258-60, 277.) Treina Wagner testified that she took K.M. to Dr. Debra Simms for a medical examination in relation to Petitioner's conduct. Dr. Simms told her that K.M. suffered from vaginal dermatitis and genital lesions. (*Id.* at 274.) K.M. was seen by Dr. Simms again on September 12, 2005. Treina Wagner did not arrange for a biopsy on K.M.'s lesions, as she was told that the condition was not serious and treatment was optional. (*Id.* at 275-76.)

Debra Simms, M.D., is a board-certified pediatrician employed by the Holland Community Hospital Foundation as a child protection specialist. (*Id.* at 282-83.) She was qualified as an expert in the field of medical evaluation of child physical and sexual abuse. (*Id.* at 285.) Dr. Simms testified that she examined K.M. on March 22, 2005. In conducting an examination, she considers background and medical information, interviews the child, performs a physical examination, including the use of a colposcope to project close images of small areas, tests for diseases, and completes a full-body evaluation. (*Id.* at 285-89.) According to Simms, K.M. presented as hyper-vigilant. She complained of abdominal pain and stated, "I think there's something wrong with me. My tummy hurts." (*Id.* at 293-94.) When asked why she hurt, she stated, I think because of what happened. . . . Shawn, my stepdad is touching my privates." (*Id.* at 295.) K.M. also told Dr. Simms that Petitioner "put his private in my private," that he "rubs it up and down" and that "he got it wet every time" and "he didn't wipe it off." (*Id.* at 296.) She complained that he also "sticks his finger where I pee." (*Id.*) K.M. explained that it had happened about ten times, mostly at night, but occasionally during the day. One time, he came in the shower and "rubbed [his private] on [her] crotch. (*Id.*)

On examination, Dr. Simms found that K.M. was pre-pubescent, at stage one, the lowest level of the Tanner scale of maturity, meaning that the hymen was recessed at that time, behind four layers of other structures. (*Id.* at 298-302, 312.) The hymen was intact and crescent shaped. (*Id.* at 299-300.) Under the colposcope, Dr. Simms noted three small lesions. (*Id.* at 298-302.) Those lesions were not classical presentations of either herpes or genital warts. Because they were small and asymptomatic, Dr. Simms did not perform a biopsy. She instead asked K.M. and her mother to attend a return visit, to check if their were any changes. She did order tests for herpes,

syphyllis, HIV, and hepatitis B and C, all of which came back negative. (*Id.* at 302-04.) When K.M. returned for a re-check five-and-one-half months later, the lesions were unchanged and K.M. had no symptoms. Dr. Simms concluded that there was no reason to subject K.M. to a biopsy. (*Id.* at 306.) Overall, Dr. Simms made no findings that were specific to sexual abuse. (*Id.* at 307.)

Stephen Atkinson, a Kalamazoo County child protective service specialist, testified that he had interviewed Petitioner about the report of sexual touching on February 2, 2004. (*Id.* at 123-24.) When asked for an explanation of what had occurred, Petitioner stated that he had heard a noise from the parking lot outside K.M.'s room. He went into her room to see what was going on outside, and he noticed K.M., lying naked in bed. (*Id.* at 125-26.) Petitioner told Atkinson that, before entering K.M.'s room, Petitioner had been having sexual urges, and those urges continued when he saw K.M. He touched the back of K.M.'s leg before Treina Wagner came into the room (*Id.* at 125.) Petitioner explained that, when he said he had sexual urges, he meant "when he had to do whatever to please himself." (*Id.* at 126.) Petitioner stated "that he went into the room having the sexual urges and that he was going to do whatever it took to please him and that he had targeted [K.M.] because she was lying naked on the bed." (*Id.* at 127.) Petitioner told Atkinson that he had made arrangements to see a counselor at the DeLano Clinic that afternoon. (*Id.*) Atkinson notified his supervisors and they authorized him to file a petition with the family court to have Petitioner removed from the home. The petition ultimately was dismissed, because the referee did not believe that Petitioner's conduct satisfied the definition of sexual abuse. (*Id.* at 127-28.) Nevertheless, CPS found the complaint to be substantiated by a preponderance of the evidence and took it seriously. (*Id.* at 128, 149-50.) They continued to work with the family on a voluntary basis. (*Id.* at 128.) Atkinson wrote in his notes that Treina Wagner stated "'that she [called CPS] in order to gain

evidence to support placement of the children with her if a divorce was necessary.'" Atkinson testified that he had talked to K.M., who told him that Petitioner "'had come into her room the previous night. [She] stated that she was sleeping and "Shawn was looking at [her] privates, I guess."'" (*Id.* at 138.) K.M. cried and told Atkinson that she did not want her mother and Petitioner to get a divorce. (*Id.* at 139.) Atkinson referred Treina Wagner for counseling, to ensure that she did not have psychological issues that would preclude her from protecting her daughter. (*Id.* at 145.) Treina Wagner expressed a desire for counseling, under the circumstances. (*Id.* at 147.) The family entered into an agreement with CPS, which included the provision that Petitioner "will cooperate with Kim Lem [of] Kalamazoo Psychology and follow all recommendations given by that program." (*Id.* at 149.) A CPS caseworker was assigned to the case and was involved for many months. (*Id.* at 153-54.)

Allyson Carneal was the CPS worker assigned to the Wagner case after Atkinson's investigation. (*Id.* at 157-58.) The Wagner family entered into a service agreement with the department, under which Petitioner would participate with a psychological evaluation with Kim Lem, K.M. and Treina Wagner would receive counseling through the Child Advocacy Center of the Guidance Clinic, and Petitioner would not be allowed to be alone with K.M. (*Id.* at 160.) Wagner saw the family three times, but saw Petitioner only twice. Petitioner only completed two of the three to four sessions needed to complete his psychological evaluation. (*Id.* at 160.) Carneal kept the case open from February 2004 until December 2004. At the time she met with the family in February, they were building the Cressey Road house, and Petitioner was acting as general contractor. Carneal had difficulty arranging to meet the family. When she met with the family in August 2004, near the time the house was completed, Petitioner expressed his intent to continue counseling after the house

was built.  (*Id.* at 161-62.)  She told the family that they needed to take K.M.'s safety more seriously, and she attempted to see them several times between August and December 2004.  (*Id.* at 163.) Carneal indicated that she routinely advises parents, and believed that she advised Treina, that if any further abuse to K.M. occurred, she would be responsible for not taking steps to prevent it.  (*Id.* at 163-64.)  In addition, when she closed her case, she sent the Wagner family a letter, indicating that the case was being closed and that they had not cooperated with services.  (*Id.* at 163.)  She told Petitioner that he needed to complete his evaluation and informed Treina Wagner that she would likely be held equally responsible if something happened in the future.  (*Id.* at 164.)  According to Carneal, Treina asked whether K.M. could go with Petitioner to the father-daughter dance that had been planned for some time.  She told them that, if Treina drove them both ways, K.M. could go to the dance.  She found out later that Treina had allowed Petitioner to take K.M. unsupervised.  (*Id.* at 164-65.)  Because the family was only cooperating voluntarily, Carneal had no leverage to compel compliance.  (*Id.* at 164.)

Heather Veres, Treina Wagner's sister, testified that her sister called her in the early evening of March 7, 2005, saying that K.M. had told her that her father was touching her.  While she was talking to Treina, Veres heard K.M. come into the room crying, asking her mother why she had told.  Petitioner apparently went out.  (Tr. II at 334-37.)  When he returned, she heard him say that he was going to stay with his father.  Treina asked, "How many times have you touched my daughter."  Petitioner responded, "Maybe once or twice."  (*Id.* at 337.)  After hearing the remark, Veres stated, "Bullshit.  How can you not know how many times you've touched a little girl?"  (*Id.* at 339-40.)

Jody Dolfman testified that she and her husband and children were family friends with the Wagners, and they had known Petitioner for about 10 years. (*Id.* at 347-48.) Treina Wagner called Dolfman on Wednesday, March 9, 2005, near lunchtime. She was very upset, wanting to talk. Dolfman told her to come over, and they spoke for about ten minutes. Near dinnertime, Treina came over again. Dolfman called State Troooper Mike Behrendt, a neighbor. Behrendt came over and spoke with Treina Wagner. After Behrendt left, Petitioner called the Dolfman home. (*Id.* at 348-49.) Petitioner wanted to speak with his wife, and Dolfman gave Treina the phone. The Wagners spoke for about one-half hour. During the conversation, Treina asked how many times he had touched her daughter. (*Id.* at 350.)

Michigan State Police Trooper Michael Behrendt confirmed that he was a neighbor of the Dolfmans and Wagners. When Jody Dolfman called him on March 9, 2005, he was off duty. At Dolfman's request, Behrendt came over to her house and talked with Treina Wagner. (*Id.* at 356-57.) After she gave him an overview, he told Treina Wagner that the state police could handle the case or it could be handled by the township. She chose to have the state police handle the matter. Behrendt told Treina Wagner that he would have a forensic interviewer interview K.M. (*Id.* at 357-58.) He did not take the case himself, as he had so many relationships with the extended Wagner family. (*Id.*)

Michigan State Police Officer Scott Sharrar was on duty on March 10, 2005. He spoke with Petitioner, who told him about an earlier incident involving K.M. (*Id.* at 359-60.) Petitioner told Sharrar that, in the earlier incident, he had heard a sound outside the trailer in which the resided. He went into K.M.'s room to look outside, and he saw that her sheets were pulled down and that she was not wearing underwear. When he saw that, he sat down on the bed and looked at

her for a minute. He was just going to cover her, when his wife came in. (*Id.* at 360-61.) Sharrar asked Petitioner if he had performed any sexual act on K.M., such as putting his finger in her vagina or putting his penis on her private area. Petitioner indicated that he had no recollection of such an event, and he did not admit to any other touching. (*Id.* at 362.) Petitioner spoke with Sharrar only briefly before requesting an attorney. (*Id.* at 364.)

Michigan State Police Trooper Dan Cook testified that he was the officer who interviewed K.M. She was alone with him in the interview room, and he recorded the entire interview. (*Id.* at 375-76.) Prior to interviewing K.M., Cook had conducted child forensic interviews for about three years and had interviewed 10 to 25 children. (*Id.* at 422.) The tape recording of the interview was played into the record. (*Id.* at 378.) K.M. told Cook that, during nights when her mother was away from home or asleep, Petitioner and would come to her room while she was sleeping and wake her. He would then take off her underwear and put his private on her private, or her crotch. (*Id.* at 387-89.) She explained that she did not know what his private was called and she did not really see it. (*Id.* at 389.) She told Cook that Petitioner had committed the acts in December and January, and later stated that Petitioner had begun the acts in January 2004, when she was nine. (*Id.* at 390, 403-04.) The second time also happened in January or March 2004. (*Id.* at 406, 408.) According to K.M., Petitioner would come into her room, spread her legs and look at her private, after which he would rub his private up and down and get it all wet. (*Id.* at 391-92, 396.) Petitioner did not say anything and the lights were off. (*Id.* at 403.) She explained that she did not know how Petitioner got his private wet, but when it was wet, he would put it on her again. (*Id.* at 392.) She stated that, on one occasion, "[L]ike he like -- my legs were spread I think, and like he -- he like peed on me." (*Id.* at 404.) K.M. told Cook that it had happened about ten times, though

- 14 -

she really was not sure.  (*Id.* at 393.)  According to K.M., Petitioner touched her even when K.M.'s brother was in the room, but, on those occasions, Petitioner would get under the covers so that her brother would not see.  (*Id.* at 391.)   Petitioner also did it when her mother was sleeping.  If he heard anything, he would quickly pull her pants up and his pants up and run to hide in the bathroom. (*Id.* at 405.)  The first time that it happened in his bed, she had fallen asleep watching TV, and her mother was outside by the bonfire pit.  That incident occurred either in March or April, she thought, possible April 17, 2004, though she acknowledged guessing at dates.  (*Id.* at 410-13, 417.) Petitioner rubbed his private on her private.  Afterward, she went into the bathroom until he went away.  She then went to the kitchen to get dinner, and continued to her room.  (*Id.* at 411-12.) Petitioner followed her to her room.  She indicated that she wanted to be left alone, but he did it again. (*Id.* at 412.)  On another occasion in 2005, Petitioner put her legs around his waist while he was rubbing his private against her private.  (*Id.* at 418-19.)

The sexual episodes happened both at the trailer and at their new house on Cressey. (*Id.* at 406-07.)  At the house on Cressey, possibly in March 2004, Petitioner rubbed his penis against her while she was in her room and her brother was watching a movie in his own room  (*Id.* at 409.) Petitioner told her not to tell her mother, but it was hard for her to keep the secret, so she told her mother.  (*Id.* at 391, 393.)  Her mother then was downstairs talking to her friend about it, but Petitioner was listening from the steps.  (*Id.* at 394.)  K.M. was upstairs watching "Fear Factor" when Petitioner came in and confronted her about telling her mother that he as touching her.  He then told her, [W]ell, if your mom calls the cops, I'm [sic] guess I'm gonna be goin' to prison . . . . I promised you I wouldn't touch you no more, but then he still did it.  He – he was still touching me."  (*Id.*)  The touching happened in her bedroom, but also in his bed, on occasions when she had

fallen asleep watching TV.  (*Id.* at 395.)  Sometimes, Petitioner would take his finger and put it in her private, and he would hurt her sometimes with his fingers.  (*Id.* at 395-96.)  K.M. told Cook that she sometimes was afraid to go home because she and her brother would be alone with Petitioner while her mother was at work until 6:30 p.m.  (*Id.* at 399.)  After the first incident in 2004, when her mother saw Petitioner looking at K.M., she yelled at him.  Petitioner left the house and then returned to tell K.M. that he was sorry for hurting her and that he still loved her.  He left again, refusing to talk with her mother.  (*Id.* at 420-21.)

YWCA Vice-President of Counseling Tom Cottrell testified that he had 22 years of experience working with about 400 cases of child sexual abuse and had been qualified as an expert in over 100 cases.  (*Id.* at 432-33.)  Cottrell had no involvement in K.M.'s treatment.  (*Id.* at 434.)  He was qualified as an expert in child sexual abuse and behavior.  (*Id.* at 435.)  Cottrell testified that children under twelve routinely assume that, if they have reported anything, the adult understands everything, so they do not repeatedly report.  (*Id.* at 436.)  It also is typical for a child to live with sexual abuse by a family member for some time before reporting.  (*Id.* at 437.)  Cottrell indicated that it would be surprising for a child of nine or ten to accurately pinpoint dates on which the abuse occurred.  (*Id.* at 438.)  But children often attempt to please an adult by providing a date, even if it is not substantively accurate, because children don't mark dates the same way as adults, and dates don't mean much to them.  (*Id.* at 439-40.)  On cross-examination, Cottrell indicated that he has never seen an incident in which a mother's revelation of her own abuse would cause a child to imagine abuse in order to comfort her mother.  (*Id.* at 448.)  Such a scenario would require brainwashing through a purposeful and focused effort over a protracted period.  (*Id.* at 446.)  It would not be caused by simple disclosure of a mother's past abuse.  (*Id.* at 446.)

The prosecution rested and the defense put on no evidence. (*Id.* at 451-53.)

At the conclusion of trial, on October 25, 2005, the jury found Petitioner guilty of one count of CSC I and two counts of CSC II. The jury was deadlocked on the second count of CSC I (*Id.* at 517.) On November 23, 2005, Petitioner was sentenced at the top of the sentencing guidelines to serve a term of 15 to 25 years on the CSC I conviction and two terms of 10 to 15 years on the CSC II convictions. (Sentencing Transcript, (S. Tr.), 10, docket #21.)

**B.      Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on July 26, 2006, raised two issues involving Trooper Sharrar's testimony. Appellate counsel claimed (1) that Sharrar's testimony that Petitioner briefly spoke to him before invoking his right to counsel violated his rights under the Fifth and Fourteenth Amendments, and (2) trial counsel was ineffective in failing to object. (*See* Def.-Appellant's Br. on Appeal, docket #22.) In an unpublished opinion issued June 19, 2007, the court of appeals rejected the claims and affirmed the convictions. (6/19/07 Mich. Ct. Appeals Op. (MCOA Op.), docket #22.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same two claims presented to and rejected by the Michigan Court of Appeals. By order entered October 29, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Order, docket #23.)

### C.    Post-conviction relief

On October 22, 2008, Petitioner filed a motion for relief from judgment in the Barry County Circuit Court.  In his motion, Petitioner raised the same four grounds for relief as presented in his habeas petition.  The motion was denied on October 29, 2008.  (*See* 10/29/08 Cir. Ct. Order, docket #24.)  Petitioner filed a delayed application for leave to appeal to both the Michigan Court of Appeals and the Michigan Supreme Court, which denied relief on the grounds that Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D) on January 25, 2010 and September 9, 2010, respectively.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v.*

*Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

**<u>Discussion</u>**

Petitioner raised all of his habeas claims for the first time in his motion for relief from judgment. Because Petitioner's claims were not raised on direct appeal, Respondent contends that all habeas grounds are procedurally defaulted.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner

asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A

habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence,

it is more likely than not that no reasonable juror would have found petitioner guilty beyond a

reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

In *Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010), the Sixth Circuit, in an

*en banc* decision, held that brief form orders by the Michigan appellate courts invoking MICH. CT.

R. 6.508(D) are unexplained orders within the meaning of *Ylst v. Nunnemaker*, 501 U.S. 797 (1991).

Such form orders are presumed to uphold or reject the last reasoned decision below. *Guilmette*, 624

F.3d at 691-92. As a consequence, the Court must look to the circuit court's decision to determine

the basis for the state court's denial of relief. The order of the circuit court states:

> Defendant's motion for relief from judgment is denied pursuant to MCR
> 6.504(B)(2) for the following reasons:
>
> 1. Defendant appealed his conviction, which was affirmed by the Court of
> Appeals on June 19, 2007.
>
> 2. Defendant's motion alleges grounds for relief which could have been
> raised on appeal.
>
> 3. Defendant's motion does not demonstrate good cause for the failure to
> raise such grounds or actual prejudice.
>
> (a) Defendant objects to joinder of multiple acts of criminal sexual conduct.
> Such acts were permissibly joined pursuant to the law cited by Defendant.
>
> (b) Defendant's asserted grounds for ineffective assistance of counsel are
> spurious.

(10/29/08 Cir. Ct. Order, docket #24.) It is apparent that the circuit court denied the motion for

relief from judgment under MICH. CT. R. 6.508(D)(3), which bars a defendant from collaterally

attacking a conviction based upon claims that could have been raised on direct appeal. *Id.* Under

the rule, a finding that a claim could have been raised in a previous appeal constitutes a procedural default, and the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." MICH. CT. R. 6.508(D)(3)(a)-(b). In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence. *Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000). Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action. *See Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).

The circuit court expressly denied Petitioner's first three grounds for relief because they were not raised on direct appeal.[2] Those grounds, therefore, are procedurally defaulted unless Petitioner can demonstrate either cause and prejudice excusing the default or actual innocence.

Petitioner makes no attempt to demonstrate actual innocence under *Schlup*, 513 U.S. at 327. Instead, in his fourth ground for relief, Petitioner argues that the ineffective assistance of appellate counsel serves as cause to excuse his default. In the order denying relief from judgment, the trial court ruled that Petitioner's ineffective assistance of counsel claim was "spurious."

---

[2] The court also ruled on the joinder and ineffective-assistance-of-trial-counsel claims on the merits. Even though the court did review the issues, this review did not waive the procedural default because it was a separate and alternative holding apart from the determination of the procedural default. *See Harris*, 489 U.S. at 264, n.10; *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991); *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989).

(10/29/08 Cir. Ct. Order, docket #24.) That finding is a merits-based rejection of Petitioner's claim that appellate counsel rendered ineffective assistance.[3]

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

---

[3]In *Guilmette*, 624 F.3d at 291, the Sixth Circuit recognized that a claim of ineffective assistance of appellate counsel may not properly be deemed procedurally defaulted under Mich. Ct. R. 6.508(D) when it is raised for the first time in a motion for relief from judgment under Mich. Ct. R. 6.502. The court reasoned that "[t]he procedural-default rule stated by Rule 6.508(D)(3) applies only to claims that could have been brought on direct appeal, and thus – by necessity – it does not apply to claims of ineffective assistance of appellate counsel." *Id.* The *Guilmette* court therefore found that the invocation of Rule 6.508(D) in such circumstances must be considered a decision on the merits of the claim. *See also Henderson v. Palmer*, No. 11-1943, 2013 WL 4838799, at *5 (6th Cir. Sept. 12, 2013). As a consequence, Petitioner's fourth habeas ground is not defaulted, and the Court will review the claim under the applicable habeas standard.

- 23 -

An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688. As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

Moreover, as the Supreme Court has observed, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *see also Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficult of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 131 S. Ct. at 786).

Petitioner cannot begin to meet this doubly deferential standard. Petitioner fails even to argue, much less show, that the issues he raised in his motion for relief from judgment were clearly stronger than the issues raised by counsel on direct appeal. *See Robbins*, 528 U.S. at 289.

Nor does he demonstrate that the trial court unreasonably found his claim of ineffective assistance of appellate counsel to be spurious. Appellate counsel raised two significant claims that were obvious on the face of the record: (1) the admission of Sharrar's testimony referring to Petitioner's post-arrest, post-*Miranda* silence violated Petitioner's Fifth and Fourteenth Amendment rights to due process; and (2) trial counsel was ineffective for failing to object. Although the Michigan Court of Appeals ultimately rejected the due process claim because the testimony was limited and harmless, the claim undoubtedly was the strongest argument available based on the record of the case. *See Jones v. Bagley*, 696 F.2d 475, 484-85 (6th Cir. 2012) (improper elicitation of a defendant's invocation of his right to counsel violates due process) (citing *Doyle v. Ohio*, 426 U.S. 610, 619 (1976)) In addition, although the court of appeals concluded that counsel was not ineffective in failing to object to the admission of the evidence, Petitioner's second appellate claim was necessary to obtain review of the first.

None of the claims raised in Petitioner's motion for relief from judgment comes close to being as strong as the claims raised on direct appeal.

### A.      Ground I:  Police and Prosecutorial Misconduct

In his first defaulted ground, Petitioner claims that Treina Wagner, the prosecutor and the police tampered with K.M.'s testimony. Petitioner's claim is without support on the record. Treina Wagner's potential influence was challenged by cross-examination and was before the jury for consideration. Moreover, nothing about her possible bias is attributable to either the police or the prosecutor. In addition, K.M.'s police interview was taped and played in its entirety to the jury, and K.M.'s statement was very similar to her trial testimony. Petitioner fails to point to anything in the questioning that was improper. Finally, Petitioner's argument that the prosecutor committed

misconduct by talking with K.M. before trial is equally unsupported.  In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  No circuit or Supreme Court precedent supports Petitioner's suggestion that a prosecutor commits misconduct when he prepares his witness for the questions he expects to ask at trial.

In sum, Petitioner fails entirely to support his claim of witness tampering.  Because the claim is frivolous, the state court reasonably rejected Petitioner's argument that appellate counsel was ineffective for failing to raise it.  *See Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal).

### B. Gound II:  Ineffective Assistance of Trial Counsel

In his second defaulted ground, Petitioner contends that trial counsel was ineffective in a variety of ways.  First, Petitioner contends that trial counsel was ineffective in neglecting to challenge the joinder of four acts of criminal sexual conduct that occurred over a one-year period of time.  Second, Petitioner argues that trial counsel was ineffective in failing to interview and present important witness testimony about Treina Wagner's use of methamphetamine and her psychological problems.  Third, Petitioner contends that counsel was ineffective in failing to present competing expert testimony and published articles about the impact of suggestive interviews and other misinformation on a child's reporting of sexual abuse.  Fourth, Petitioner contends that trial

counsel was ineffective in failing to object to the expert's opinion bolstering the child witness' testimony.

Petitioner's claims of ineffective assistance of trial counsel are exceptionally weak. First, with respect to the joinder claim, the trial court concluded that, under the state law cited by Petitioner, *see* MICH. CT. R. 6.120(B)(1), the four acts were properly joined. (10/29/08 Cir. Ct. Order, docket #24.) It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). Because the state court held that joinder was proper under state law, neither trial counsel nor appellate counsel was ineffective for failing to raise the joinder issue. *Burton*, 391 F.3d at 781-82 (holding that appellate counsel need not raise frivolous issues).

Second, Petitioner claims that James Heistand, who had lived with the couple in 2001 to 2002, was prepared to testify that Treina Wagner had abused illegal amphetamines and acted crazy during that time. Petitioner contends that trial counsel was ineffective in failing to interview Heistand and introduce his testimony at trial. Petitioner argues that Heistand's testimony would have supported the defense theory that Treina Wagner induced K.M. to fabricate abuse in order to support her divorce case. Petitioner's argument is frivolous. Heistand's proposed evidence was improper extrinsic character evidence about Treina Wagner's conduct nearly three years before the date of the incidents in question. *See* MICH. R. EVID. 608(b) (barring extrinsic evidence of

character). No reasonable attorney would have pursued the evidence, either at trial or on appeal, because it was irrelevant and inadmissible.

Third, Petitioner has pointed to no evidence in the record that would suggest that K.M. was subjected to suggestive questioning. In the absence of such evidence, Petitioner cannot demonstrate that an expert witness was necessary to explain the effects of such questioning. Moreover, the state's expert expressly acknowledged that a person could, under certain circumstances, influence a child to fabricate stories. But the mere possibility that adults could influence a hypothetical child's testimony did not make explaining that possibility relevant or necessary to the case in question. Indeed, an expert's opinion about how a child's testimony could be influenced had the likelihood of underscoring why those circumstances did not appear in Petitioner's case. As a consequence the decision not to call an expert was both reasonable and nonprejudicial.

In addition, counsel was not required to attempt a cross-examination using published articles to impeach an expert who had already acknowledged that debate existed concerning the possibility of influencing child testimony. The articles recited by Petitioner concern factual circumstances entirely distinct from those at issue in the case. They therefore would not have provided a vehicle for effective impeachment. As previously discussed, trial counsel engaged in thorough and effective cross-examination of all witnesses, especially Treina Wagner. Trial counsel's decision to rely on the mere suggestion of improper influence was patently reasonable, given the lack of evidence to support the theory.

In his final claim of ineffective assistance of trial counsel, Petitioner contends that his attorney was ineffective in failing to object to the expert's bolstering of the child witness.

Contrary to Petitioner's characterization, the expert testified in response to a hypothetical question about a child's response to revelations about a mother's prior abuse. Nothing about that testimony amounted to improper bolstering of the child witness. Because any objection would have been frivolous, counsel was not ineffective in failing to object.

In sum, appellate counsel acted reasonably in declining to raise the ineffective-assistance-of-counsel claims Petitioner presented in his motion for relief from judgment. The state court's determination therefore was a reasonable application of established Supreme Court precedent.

### C.      Ground III:  Cumulative Error

Petitioner argues that, even if the Court were to conclude that no single error was sufficiently prejudicial to undermine his conviction, the errors collectively were highly prejudicial. He therefore asserts that appellate counsel should have raised the claim on appeal.

Petitioner's claim is frivolous. As previously discussed, Petitioner's habeas claims are all meritless. As a result, there existed no error to cumulate. *See Seymour*, 224 F.3d at 557. Appellate counsel therefore acted entirely reasonably in declining to raise the issue on appeal.[4]

---

[4]In addition, under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655. The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review. "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002).

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated: March 31, 2014                                    /s/ Hugh W. Brenneman, Jr.
                                                         HUGH W. BRENNEMAN, JR.
                                                         United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).